# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| [UNDER SEAL], | Case No. |
| **Plaintiff,** | **COMPLAINT** |
| **v.** | |
| [UNDER SEAL], | **FILED UNDER SEAL** |
| **Defendant.** | **PURSUANT TO 31 U.S.C.** |
| | **§ 3730(b)(2)** |

## DOCUMENT TO BE KEPT UNDER SEAL
### (DO NOT PLACE ON PACER)

Peter Chatfield (DC Bar No. 418576)
PHILLIPS & COHEN LLP
2000 Massachusetts Ave. NW
Washington, D.C.  20036
Tel: (202) 833-4567
Fax: (202) 833-1815
pchatfield@phillipsandcohen.com

Taeva C. Shefler (*pro hac vice* pending)
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001
tshefler@phillipsandcohen.com

Attorneys for Plaintiff-Relator [Under Seal]

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>C/O Attorney General<br>Jefferson Sessions,<br>U.S. Department of Justice,<br>950 Pennsylvania Ave., N.W.,<br>Washington, D.C. 20530-0001<br><br>and<br><br>United States Attorney Jessie K. Liu,<br>U.S. Attorney's Office for the<br>District of Columbia,<br>555 4th Street, N.W.,<br>Washington, D.C. 20530<br><br>*ex rel.*<br><br>BARRY ELLENTUCK<br>6364 Ramwyck Court,<br>West Bloomfield, MI 48322<br><br>Plaintiffs,<br><br>v.<br><br>HOMRICH WRECKING INC.,<br>200 Matlin Road,<br>Carleton, MI 48117;<br><br>ROGER HOMRICH,<br>C/O Homrich Wrecking Inc.,<br>200 Matlin Road,<br>Carleton, MI 48117;<br><br>ADAMO DEMOLITION COMPANY,<br>A/K/A ADAMO GROUP, INC.,<br>320 East Seven Mile Road,<br>Detroit, MI 48203;<br><br>ESTATE OF JOHN ADAMO,<br>C/O Adamo Demolition Co.,<br>320 East Seven Mile Road,<br>Detroit, MI 48203;<br><br>RICHARD ADAMO,<br>C/O Adamo Demolition Co.<br>320 East Seven Mile Road,<br>Detroit, MI 48203; | Case No:<br><br>Assigned to:<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMAND**<br><br><br>**FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2)** |

MCM MANAGEMENT
CORPORATION,
   35980 Woodward Ave.,
   Suite 210,
   Bloomfield Hills, MI 48304;

ROBERT MARDIGIAN,
   C/O MCM Management Corp.,
   35980 Woodward Avenue
   Suite 210,
   Bloomfield Hills, MI 48304;

RICKMAN ENTERPRISES,
   15533 Woodrow Wilson St.,
   Detroit, MI, 48238;

RODERICK RICKMAN,
   C/O Rickman Enterprises,
   15533 Woodrow Wilson St.,
   Detroit, MI, 48238;

CITY OF DETROIT,
   C/O Corp. Counsel, Coleman Young
   Municipal Center,
   2 Woodward Ave., Suite 500,
   Detroit, MI 48226;

DETROIT BUILDING AUTHORITY,
   1301 Third St., Suite 328,
   Detroit, MI 48226;

DETROIT LAND BANK
AUTHORITY,
   500 Griswold Street,
   Suite 1200,
   Detroit, MI 48226;

JOHN AND JANE DOE DETROIT
CITY AGENTS AND
REPRESENTATIVES WHO
MATERIALLY BENEFITED FROM
PARTICIPATING IN DEFENDANTS'
FRAUD,
   C/O Corp. Counsel for the City of
   Detroit, Coleman A. Young
   Municipal Center,
   2 Woodward Ave.,
   Suite 500,
   Detroit, MI 48226

                  Defendants.

# I.    **INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States of America for violations of the federal False Claims Act, 31 U.S.C. § 3729, et seq. (the "FCA") by all persons and entities named as defendants in this action (hereafter referred to globally as the "Defendants") and by Defendants' named and un-named co-conspirators.  Defendants named herein include two categories of entities and people:  (a) private contractors and their owners and principals who profited financially from Defendants' fraud (collectively, the "Contractor Defendants") and (b) local government entities and officials including the City of Detroit, Detroit Building Authority, Detroit Land Bank Authority, and any and all of those entities' culpable agents who personally profited in any material way from the fraud alleged herein (collectively, the "City Defendants").

2.      In order to further its general objective to help stimulate economic development within the United States and to help sustain and reinvigorate collapsing housing markets, beginning in 2013, the United States' Department of Treasury, operating by and through its Troubled Asset Relief Program ("TARP"), began using TARP's Housing Finance Agency Innovation Fund for the Hardest Hit Housing Markets ("Hardest Hit Fund" or "HHF") to provide funds through housing finance agencies in seven states to demolish vacant and abandoned homes under the Blight Elimination Program ("BEP").  The goal underlying BEP was to stabilize real estate markets and encourage future growth in blighted urban neighborhoods by tearing down abandoned and blighted properties that attracted crime and depressed the values of surrounding

homes and neighborhoods. While wholly federally funded by the HHF, BEP delegated significant program oversight to its state partners, and allowed certain program guidelines to be developed locally, based on local needs in order to optimize the overall positive impact of the program.

3.    This action arises out of a conspiracy entered into among Defendants and others through their respective agents to submit, and cause the submission of, false and inflated claims to the United States' Blight Elimination Program in and around Detroit, Michigan and to support those false claims with false records and statements material to the payment of those false claims.

4.    Defendants defrauded the United States Treasury in two principal ways. First, Defendants entered into and thereafter executed a conspiracy to submit, and cause the submission of, false and/or fraudulent claims through the Conventional Demolition Program administered by MSHDA.  The purpose of this conspiracy was to obtain for political friends and allies of the City Defendants inflated, noncompetitive prices for the demolition of the parcels under the contract.  With the unlawful help of City Defendants City of Detroit, Detroit Building Authority ("DBA"), and Detroit Lank Bank Authority ("DLBA"), as well as individuals representing those entities, including Mike Duggan, David Manardo, James Wright, and Carrie Lewand-Monroe, the Contractor Defendants thereby secured contacts to demolish properties under BEP when they were not (or, in the presence of genuinely competitive bidding, would not have been) the lowest bidder. Such awards were made in violation of open competition requirements established in state and local procurement rules, and Detroit's own HHF BEP program procedures / bidding requirements. The selection of unlawfully favored contractors led to increased costs to

the HHF program and to a reduction in the amount of blighted properties that would have been removed from Detroit neighborhoods using available federal funding had the rules of BEP and Michigan's implantation plan of action been honestly and faithfully applied.

5.    Additionally, Defendant Contractors defrauded the United States Treasury by improperly redistributing costs within their contracts, once those contracts had been awarded and signed. Under the Conventional Demolition Program, contractors were required to bid on the abatement and demolition costs by individual parcel. Defendants knew that there was a federally mandated $25,000 hard cap for final all-in costs of demolition per parcel. To optimize the number of blighted properties that could be eliminated overall, properties for which demolition costs should be expected to exceed that cap were not eligible to become part of the program. However, rather than excluding a parcel from the program when they knew it would cost more than capped amounts to demolish and returning the parcel to the City, Defendants would redistribute costs to other, less expensive homes, in order to recoup total costs while avoiding the threshold distribution cap. Defendants' use of redistributing costs in the submissions of claims for payment thus also was fraudulent, led to increased costs to the HHF program, and reduced the overall effectiveness of BEP spending to achieve program goals.

6.    Second, Defendants conspired to unlawfully limit bidding to favored contractors, and thereby to fix the bidding at inflated prices for claims for HHF funds under "unit price" contracts (the "Unit Price Program") submitted to Michigan's implementing agency, the Michigan State Housing Development Authority ("MSHDA"). Defendants' collusion led to contracts at inflated prices, which directly resulted in the loss of HHF funds that should have been available to demolish additional blighted

properties.

7.    Having thus unlawfully obtained BEP contracts at inflated prices and for ineligible properties, Contractor Defendants thereafter also submitted (and City Defendants thereafter knowingly approved unlawfully) claims for payment from federal funds for change orders and additional accommodations for work that had been required to be included under the initial contracts. Contractor Defendants knew the contracts covered the work specified in the change orders, but sought payment for, and were paid, for the additional change orders anyway.

8.    Each and every Defendants' fraud directly resulted in the loss of funds from the United States Treasury and further undermined the overall reach of BEP in eliminating additional blight that would have been possible but for Defendants' fraud.

9.    Through this *qui tam* action, Relator seeks to redress the harms through the recovery of damages and civil penalties on behalf of the United States for Defendants' conspiracy; for their knowing submission of, and for knowingly causing others to submit, false or fraudulent claims; and for their creation of false records and statements material to the false claims they sought to have paid from federal funds.

## II.    **PARTIES**

### A.    **Defendant Demolition Contractors**

10.    Homrich Wrecking Inc. ("Homrich") is a demolition contractor headquartered at 200 Matlin Road, Carleton, MI 48117. Homrich has received tens of millions of dollars in federal HHF funding under the Blight Elimination Program from 2013 to present, through both the "Conventional Demolition Program" and the "Unit Price Program."

11.     Roger Homrich, in his individual capacity: Roger Homrich was, at all times relevant to this Complaint, owner and CEO of Homrich Wrecking Inc. and had authority to make decisions on the company's behalf. Mr. Homrich can be found C/O Homrich Wrecking Inc., 200 Matlin Road, Carleton, MI 48117. Mr. Homrich knew of the fraud alleged herein, knowingly participated in it, and personally benefitted from the improper payments his company realized from it.

12.     Adamo Demolition Company a/k/a/ Adamo Group Inc. ("Adamo") is a demolition contractor headquartered at 320 East Seven Mile Road, Detroit, MI 48203. Adamo has received tens of millions of dollars in federal HHF funding under the Blight Elimination Program from 2013 to present, through both the "Conventional Demolition Program" and the "Unit Price Program."

13.     Estate of John Adamo: Prior to Mr. John Adamo's death, he was President of at Adamo and at times relevant to this Complaint, had authority to make decisions on the company's behalf. The Estate of John Adamo can be found C/O Adamo Demolition Company, 320 East Seven Mile Road, Detroit, MI 48203. John Adamo knew of the fraud alleged herein, knowingly participated in it, and personally benefitted from the improper payments his company realized from it. Beneficiaries from his estate have improperly profited from his fraud.

14.     Richard Adamo, in his individual capacity: Prior to Mr. John Adamo's death, Richard Adamo reported to Mr. John Adamo, and after John Adamo's death, took over as the President of Adamo. At all times relevant to this Complaint, Richard Adamo had authority to make decisions on the company's behalf. Richard Adamo can be found C/O Adamo Demolition Company, 320 East Seven Mile Road, Detroit, MI 48203.

Richard Adamo knew of the fraud alleged herein, knowingly participated in it, and personally benefitted from the improper payments his company realized from it.

15.    MCM Management Corporation ("MCM") is a demolition contractor headquartered at 35980 Woodward Avenue Suite 210, Bloomfield Hills, MI 48304. MCM has received millions of dollars in federal HHF funding under the blight elimination program from 2013 to present, through both the "Conventional Demolition Program" and the "Unit Price Program."

16.    Robert Mardigian, in his individual capacity: At all times relevant in the Complaint, Robert Mardigian served as CEO/President of MCM Management Corporation and had authority to make decisions on the company's behalf. Mr. Mardigian can be found C/O MCM Management Corporation, 35980 Woodward Avenue Suite 210, Bloomfield Hills, MI 48304. Mr. Mardigian knew of the fraud alleged herein, knowingly participated in it, and personally benefitted from the improper payments his company realized from it.

17.    Rickman Enterprises is a demolition contractor headquartered at 15533 Woodrow Wilson St., Detroit, MI, 48238. Rickman Enterprises has received federal HHF funding under the blight elimination program through the "Conventional Demolition Program," and participated in a fraudulent invoicing scheme to avoid the Treasury's $25,000 per property HHF reimbursement threshold cap.

18.    Roderick Rickman, in his individual capacity: At all times relevant in the Complaint, Roderick Rickman served as CEO of Rickman Enterprises and had authority to make decisions on the company's behalf. Mr. Rickman can be found C/O Rickman Enterprises, 15533 Woodrow Wilson St., Detroit, MI, 48238. Mr. Rickman knew of the

fraud alleged herein, knowingly participated in it, and personally benefitted from the improper payments his company realized from it.

**B.    City Defendants**

19.    The City of Detroit is a municipal corporation as defined by the laws of the state of Michigan.  It is headquartered and can be found C/O Corporation Counsel at the Coleman A. Young Municipal Center, 2 Woodward Ave., Suite 500, Detroit, MI 48226.

20.    The Detroit Building Authority ("DBA") is a public body corporate created and operated by the City of Detroit, and headquartered at 1301 Third St., Suite 328, Detroit, MI 48226. The DBA manages and coordinates commercial and residential building design, construction, and demolition on behalf of the City. During relevant times, employees at DBA included Executive Director David Manardo, Deputy Director James Wright, Director of Special Project Brian Farkas, and Special Consultant Tom Ouvrey.

21.    The Detroit Land Bank Authority ("DLBA") is a corporation headquartered at 500 Griswold Street, Suite 1200, Detroit, MI 48226. The DLBA was created by the City of Detroit in 2008 and is a local land bank fast track authority created pursuant to the provisions of Michigan's Land Bank Act. The DLBA is permitted to hold, sell, and demolish abandoned or blighted properties to stabilize Detroit neighborhoods. From 2013 to present, the DLBA has been awarded approximately $258 million in federal HHF funds to perform blight elimination work.

22.    During relevant times, employees at DLBA included Richard Weiner, Executive Director from January 2014 through October 2014; Kevin Simowski,

Case 1:17-cv-02563-APM    Document 1    Filed 11/29/17    Page 11 of 44

Executive Director from October 2014 through October 2015; Carrie Lewand-Monroe, who served as Senior Advisor at DLBA and later served as Executive Director from October 2015 through July 2017; Pura Bascos, who replaced Lewand-Monroe as Director of Demolition Projects, from October 2015 until January 2017; and Rebecaa Carmago, Director of Demolition Projects from January 2017 until September 2017.

23.     John and Jane Doe Defendants ("Doe Defendants) are agents and representatives of the above-named City Defendants that personally profited in any material way from those persons' knowing participation in the misconduct alleged herein. Doe Defendants may include, but are not necessarily limited to, the agents and representatives of City Defendants identified in the allegations set forth in this Complaint, but Relator does not currently have insight as to whether such persons personally benefited in any material way from the role they played in planning and implementing the fraud alleged herein or whether they acted solely within the professional capacities.

**C.     Plaintiff/Relator**

24.     *Qui Tam* Plaintiff/Relator Barry Ellentuck ("Ellentuck" or "Relator"). Ellentuck is the principal of ADR Consultants and resides at 6364 Ramwyck Court, West Bloomfield, MI, 48322. From September 11, 2012 until April 2015, ADR contracted with Michigan Land Bank fast track authority/MSHDA as administrator of the HHF Blight Elimination Program for the City of Detroit.  In that capacity, Ellentuck learned about the fraud alleged herein, warned state and local authorities about the irregularities he was witnessing, ultimately alerted federal officials to the matters alleged herein and thereby caused the United States Government to begin criminal and civil investigations into the

matters described herein, Relator is thus an "original source" of the allegations set forth in this Complaint within the meaning of the federal False Claims Act.

## III.    JURISDICTION AND VENUE

25.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C §§ 3729 and 3730.

26.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. 3732(a) because that section authorizes nationwide service of process. Moreover, Defendants have transacted business in this District through their knowing participation in conspiracies and fraud that they all knew would result in the submission of claims for federal funds provided by and administered and overseen through the United States Department of Treasury, which is located in this District.

27.    Venue is proper in the District of the District Columbia pursuant to 28 U.S.C § 1391(b), 28 U.S.C. § 1395 (a), and 31 U.S.C. § 3732(a) because the Defendants transact or have transacted business in, this District. At all times relevant to this Complaint, Defendants regularly conducted, and continue to conduct, substantial business within this District through the submission of claims to the United States Treasury, which are the subject of this Complaint.

## IV.    APPLICABLE LAW

### A.    The False Claims Act

28.    Congress enacted the FCA during the Civil War and substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the

United States to recover losses sustained as a result of fraud against it. Congress amended the FCA after finding that fraud in federal programs was pervasive and that the statute, which Congress characterized as the primary tool for combating fraud against the government, needed modernization. Congress amended the FCA to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

29.     The FCA imposes liability upon entities that: (a) knowingly present, or cause to be presented, false or fraudulent claims for payment or approval; (b) knowingly make or use, or cause to be made or used, false or fraudulent records or statements material to false or fraudulent claims; (c) knowingly make, use, or cause to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly conceal or avoid or decrease obligations to pay or transmit money or property to the Government; or (d) conspire to violate any of these provisions. 31 U.S.C. §§ 3729(a)(1)(A)–(C), (G).  Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages the United States sustains. *Id.* § 3729(a)(1).

30.     For purposes of the FCA, a person "knows" a claim or statement is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1).  The FCA does not require proof that a defendant specifically intended to commit fraud. *Id.*

31.     The FCA allows any person having information about an FCA violation to

bring an action on behalf of the United States and to share in any recovery. The FCA requires the Complaint to be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

**B.      The Housing Finance Agency Innovation Fund for the Hardest Hit Housing Markets under the Troubled Asset Relief Fund.**

32.     The Department of Treasury's Housing Finance Agency Innovation Fund for the Hardest Hit Housing Markets ("HHF") program was created in 2010, under Sec. 101 and 109 of the Emergency Economic Stabilization Act of 2008 (P.L. 110-343) ("EESA"). This federal fund aims to "help families in the states that have been hit the hardest by the aftermath of the housing bubble."

33.     HHF efforts to aid families initially focused on mortgage purchases, mortgage principle reduction, and relocation assistance. Parallel efforts by the U.S. Department of Housing and Urban Development ("HUD") focused on demolishing blighted properties. HUD initially allocated $300 million to blight elimination under its Neighborhood Stabilization Program ("NSP"), but quickly expended its Federal funds for blight elimination.

34.     In 2013, Treasury expanded HHF to continue these blight elimination efforts. Federal blight elimination efforts fund the removal of vacant and abandoned properties in strategically targeted neighborhoods. Left unmanaged, blighted properties depress neighboring property values and can pose safety hazards. The federal HHF Blight Elimination Program plays a critical role in stabilizing and increasing home values. Currently, Treasury's Blight Elimination Program allocates nearly $622 million among

seven state agencies.

35.     Treasury relies on state and local partners to implement and oversee the HHF program in an efficient manner, executing agreements with each participating state housing finance agency ("HFA") and their respective program partners, or "eligible entities." Federal funds flow through these entities to intended program beneficiaries, such as homeowners requiring mortgage assistance or contractors performing blight removal work.

36.     In disbursing the federal HHF funds to Michigan, Treasury entered into a financial instrument purchase and participation agreements ("HHF Agreement") with Michigan's state HFA, the Michigan State Housing Development Authority ("MSHDA"), and a MSHDA created program partner, the Michigan Homeowner Assistance Nonprofit Housing Corporation ("MHA"). This HHF Agreement has been in effect since June 23, 2010, and was amended June 6, 2013 to include blight elimination activities.

37.     Under the HHF Agreement, the Michigan Homeowner Assistance Nonprofit Housing Corporation was delegated the power "to receive HHF Program funds and act to implement the Services" of the program.

38.     Treasury also required the MHA and MSHDA to "develop, enforce and review on a quarterly basis for effectiveness, an internal control program designed to minimize the risk of fraud, mitigate conflicts of interest, maximize operational efficiency and effectiveness and ensure effective delivery of" relevant services, including blight elimination. The MHA/MSHDA have been required to re-certify, on an annual basis, the effectiveness of this internal control program. *See* Michigan's HHF Agreement at 4(a).

39.     Under these agreements, both the MSHDA and the MHA were also required to "represent and warrant ... compliance with, and covenants that all Services will be performed in compliance with, EESA and all Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, applicable to the provision of the Services by HFA and Eligible Entity, or its officers, employees, agents or contractors...."

40.     In implementing the federal HHF BEP program, the Michigan Land Bank ("MLB") in turn developed agreements with municipal entities receiving HHF funds. Municipal entities entered into agreements with the MLB as well as the MHA, and were directly responsible for identifying blighted properties, and securing the procurement of demolition services for those properties. Municipal entities would perform the work subject to the terms of these agreements, submit invoices to the MHA/MSHDA's HHF funding pool on a per property basis, then disburse the federal HHF funds to relevant contractors. The Detroit Land Bank Authority ("DLBA") was the municipal entity responsible for these duties for the city of Detroit.

### 1.     Price Cap Requirements

41.     Treasury has established a maximum allowable cost per property for blight elimination in HHF Agreements. This maximum of $25,000 per structure includes "payoff of existing lien (if applicable); demolition costs, a one-time project management fee, and maintenance fee," and assistance can only be distributed once per property. *See* Michigan's Amended HHF Agreement (Seventh Amendment, effective June 6, 2013), Blight Elimination Program Service Schedule B-5.

42.     To comply with this cap, the Detroit Land Bank Authority's internal

policy imposed further restrictions, assessing bids with the assumption that administrative costs would average $2,500. As a result, if "hard costs" of demolition exceeded $22,500, the DLBA assumed it would be over the Treasury requirement. Eligible DLBA demolition costs therefore in fact had to be below $22,500.

43.     This Treasury price cap reflects a high-end maximum, not average, anticipated costs. In 2015, Michigan reported to Treasury that the median cost of HHF Blight Elimination Program demolitions was $10,558. *See* Michigan State Housing Development Authority, Michigan 4th Quarter 2015 Performance Report (October-December) at 13, *available at* https://www.michigan.gov/documents/mshda/HFA_MI _Q42015_516438_7.pdf.

### 2.    Open Competition Requirements

44.     Requirements that municipal entities procure demolition contractors through competition – including open bidding and awarding work to lowest bidders – were clear in MHA/MLB procurement policies, agreements between the DLBA and MHA/MLB, and the jointly-issued MLB/DLBA bidding request for proposals (RFPs) themselves.

45.     The DLB's proposal, submitted to MHA for eligibility for HHF Blight Elimination Program funds, itself outlined that bidding would be through an open process, and that awards would go to the lowest qualified bidder.

46.     This competitive process was also required by Detroit's local procurement rules, which required that the municipal "purchases, in accordance with applicable ordinances, rules, and procedures, are done on a bid basis, with the lowest acceptable bid receiving award. Lowest acceptable bids are those that meet the specifications of the bid,

at the lowest cost." Detroit, Michigan, Municipal Code § 18-5-7.

47.    From 2012-2015, the Michigan Land Bank Authority (MLB) retained Relator Barry Ellentuck's company ADR Consultants to assist in the program implementation and disbursement of TARP funds related to blight elimination. In 2013, Relator was asked by MLB to manage the City of Detroit's federally funded HHF Blight Elimination Program. Michigan state authorities retained Relator, specifically citing concern that the City of Detroit and DLBA lacked the expertise to effectively administer the program. At the time, Detroit had received an initial HHF funding allocation of $52 million.

48.    Relator's work, funded by the MLB on behalf of the DLBA, was governed by a 2013 intergovernmental agreement between the MLB and DLBA. In this agreement, the MLB specifically required that its "contractors must be procured through a competitive procurement process." Though HHF-BEP program contracts were made directly between the DLBA and contractors – rather than MLB and contractors – Relator Ellentuck understood that a process he created and ran, as an MLB designee, needed to be competitively procured. MLB was paid $100 per property by DLBA for ADR's program management services on the HHF program.

49.    Relator Ellentuck and ADR Consultants accordingly designed and operated the DLBA Blight Elimination Program in accordance with the open competition rules required in the DLBA's own HHF program proposal, Detroit's local procurement rules, and the MLB/MSHDA procurement guides as approved by MSHDA, MLB, DLBA, and the City of Detroit.

50.    Pursuant to these requirements, Relator created competitive bid

environments using Request for Proposal ("RFP") and Request for Qualification ("RFQ") components, on behalf of the DLBA, for HHF funded blight demolition contracts. The DLBA program, as designed by Relator, utilized contractor qualification pools, open procurement, award scoring and award committees. The proposed DLBA HHF award program was submitted to and approved by the MLB and MSHDA, and the first RFQ for qualified contractors went out October 2013.  Pre-demolition inspections and asbestos surveys commenced shortly after, and the first RFP was issued on March 10, 2014.

51.     The DLBA program furthermore mandated that bidding contractors submit affidavits of non-collusion. All eligible contractors – including Defendants Adamo, Homrich and MCM – submitted affidavits attesting to non-collusion as a pre-requisite to eligibility for the federal HHF funding award.

## C.    Detroit HHF BEP Program Background

52.     To date, Detroit has received approximately $258 million in federal HHF Blight Elimination Program funds through the MHA. Funding has been disbursed in five separate bidding rounds, HHF-1 through HHF-5.

| Initial RFP Date | Funding | Round # |
|---|---|---|
| October 2013 | $57 Million | HHF-1 |
| December 2014 | $50 Million | HHF-2 |
| November 2015 | $21 Million | HHF-3 |
| October 2016 | $42 Million | HHF-4 |
| May 2017 | $88 Million | HHF-5 |

53.     Detroit's HHF BEP funds have been distributed under two bidding

programs. Typically, under the "Conventional Demolition Program," the DLBA would release an RFP packet, identifying individual blighted properties requiring demolition. A pool of pre-qualified contractors, all screened as eligible and able to perform the work, would individually submit their price bids for the work. These bids may be for individual residential, or parcels of blighted properties, and were based on square footage of properties and the contractor's individual estimates of associated demolition costs and post-demolition abatement costs. The DLBA would then review bids, and award the contract to the lowest bidder. Demolition would occur, then contractors would submit invoices for reimbursement to the DLBA, which would in turn pass invoices to MHA/MSHDA authorities via a database connecting individual invoices to each house. MSHDA/MHA would then remit funds, up to Treasury's $25K per house, to DLBA, which would in turn reimburse contractors.

54.    Under one program – implemented under the HHF-1 and HHF-2 rounds in 2013 and 2014 – high volume, unit price contracts were executed to three contractors selected via an RFQ seeking bidders able to demolish 800 homes each within a 60-day contract (also referred to as the "Unit Price Program"). Rather than going through an individual, parcel-based bid process, the properties were assigned directly by ADR and were paid at a fixed rate of .52 cents per "cubic" foot.

55.    In 2015, investigations by the MSHDA revealed numerous violations in the Detroit Blight Elimination Program, including fraudulent invoicing, systemic failure to award bids to lowest bidders, and significant cost overages. Prior to this audit, Relator Ellentuck had repeatedly expressed concerns about similar conduct to state and local program authorities. Beginning in April 2015, Relator Ellentuck alerted state and federal

investigators to allegations described in this Complaint.

56.     On August 1 2016, Treasury suspended demolition activities in Detroit,
holding back $42 million in earmarked federal HHF funds. According to a suspension
memorandum, Treasury's decision to suspend funding was based on the information
provided by MSHDA concerning their investigation and audit of HHF expenditures.
Treasury authorized MSHDA and MHA to resume HHF-funded demolition activities
only after a "Reimbursement Agreement" was executed on October 14, 2016, outlining
enhanced controls for the program.

## V.     SUMMARY OF ALLEGATIONS

### A.     Conventional Demolition Program

1.     Defendants failed to award contracts to lowest bidders, violating
the MLB's open competition requirements and leading to
overcharges to the federal HHF.

57.     From 2013 to present, the DLBA has knowingly and with unlawful
purpose failed to award contracts to lowest bids, as required under state and local open
competition requirements. This failure to award contracts to the lowest bidder resulted
from a conspiracy between Defendants, allowing Contractor Defendants to wrongfully
receive and fraudulently bilk federal HHF funds.

58.     Only pre-qualified contractors were eligible to bid in the DLBA HHF
Blight Elimination Program. All contractors offering bids were therefore determined by
the DLBA to be capable and certified to execute demolition work.

59.     In March 2014, after the first Conventional Demolition Program awards
were released, Relator became aware of DLBA's failure to award contracts to the lowest
bidder. In one HHF bid round, the lowest qualified bidder, Able Demolition, submitted a

bid of $1,801,629.06 to complete work on 139 parcels of blighted properties. DLBA instead awarded contracts to Defendant contractor Homrich, whose bid to do the same work on the same set of parcels was significantly higher at $2,630,200.00.

60.     At the time, Relator objected to DBA employee James Wright about these decisions. Wright and other DBA and DLBA officials offered no rationale for failing to award the federal HHF funding to the lowest eligible contractors as required and took no corrective action.

61.     Relator Ellentuck then relayed his concerns to Michele Wildman, Interim Executive Director (MLB) and Director of Special Projects (MSHDA).  Ms. Wildman told Relator to continue reporting on the conduct, and that HHF program control would be removed from the DLBA and begin to be administered by the state entities directly. To his knowledge, however, no action was taken by the MLB.

62.     Relator became aware that the failure to award bids to lowest bidders was not isolated, but instead systemic. On information and belief, these inflated bids were awarded as a result of conspiracy between James Wright and other officials working for City Defendants, and select contractor Defendants with whom they had personal relationships and sought to enrich. Defendant contractors Adamo and Homrich, on separate occasions, were ultimately all awarded HHF bids that were higher than the lowest qualified bid. Other non-party contractors also benefitted from the DLBA awarding bids that were higher than the lowest qualified bid, including, but not limited to, ABC Demolition, DMC Consultants, Blue Star, Inc. and Able Demolition.

63.     Relator became concerned that the failure to award bids to lowest bidders was causing fraudulent waste of the limited federal HHF funds. Relator reported his

findings to David Manardo, James Wright, Brian Farkas and Michele Wildman starting in
March 2014.  On April 1, 2014, Relator ran a cost report and found that costs were
approximately 19% higher under HHF-1 versus previous HUD demolition contracts,
controlling for structures with a similar size and demolition process, with the average cost
of $6.69 sq ft v. $5.41/sq ft.

64.     Relator continued to report his findings to the City officials at DBA,
DLBA, and MLB, including, *inter alia*, Carrie Lewand-Monroe, David Bell, Michele
Wildman, and Jeff Huntington, from March 2014 until April 2015 through meetings,
phone calls, and in person conversations.  None of the entities took any action.

2.     Defendants fraudulently redistributed costs to evade Treasury's per
property price cap and wrongfully receive excessive HHF
reimbursements.

65.     Pursuant to Treasury requirements, the maximum allowable cost per
property for HHF blight elimination is capped at $25,000 per structure. To comply with
this cap, DLBA more stringently required "hard costs" of demolition to fall beneath
$22,500, with additional $2,500 allowable for "soft costs." To pre-emptively comply with
these caps, Relator Ellentuck and ADR Consultants would remove properties from bid
packs whose estimated demolition cost exceeded the cap.

66.      In April 2015, Relator Ellentuck was terminated by the MLB for
convenience and no longer participated in oversight of the DLBA HHF program.

67.     By April 2016, Relator became aware that Defendants DBA and DLBA,
through employees James Wright and other DLBA officials, no longer removed
properties that exceeded the cap from bid packs. Instead, the DLBA had begun directing
HHF BEP contractors to falsify their demolition expenses to evade Treasury's per

property funding cap. Contractors were asked to, and did, create and submit false records, shifting funds from more expensive demolition projects to less expensive projects, to maximize their federal HHF funding recovery. This conduct was known among contractors as "price splitting."

68.    Relator learned the above information directly from HHF contractors whom had been given this directive by the DLBA and were concerned about the request. Relator was also told by an HHF contractor at Able Demolition – Wendy Sitek – that a DLBA official, Martha Delgado, had approached her, requesting that Sitek sign an affidavit blaming this "price splitting" conduct on a former DLBA employee, Aradondo Haskings.

69.    On information and belief, the contractors that most egregiously benefitted from the redistribution of costs were named contractor Defendants Homrich Wrecking, Adamo Construction, MCM Management, and Rickman Enterprises. Other non-party contractors who also benefitted from the fraudulent redistribution of HHF costs included but were not limited to ABC Demolition and Direct Contracting.

70.    City Defendants, including officials in DLBA and DBA, conspired with individual contractor Defendants as well as non-party contractors to redistribute costs by directing the falsification of invoices, approving demolitions, and passing on invoices known to be false for federal HHF reimbursement.

71.    Due to delays and failure to complete work, the first HHF rounds of funding had not been fully reimbursed or closed out by April 2016. Relator therefore believed that the DLBA's directive to falsify invoices and records impacted all HHF funding rounds distributed to date.

**B.    The Unit Price Contracts**

1.    Defendants Colluded by Setting Unit Pricing in Advance of the Request for Quotation.

72.    The DLBA had promised Mayor Mike Duggan a high volume of demolition under the HHF Program, but by early spring 2014, demolitions under the Program were behind schedule.

73.    On May 22, 2014, Relator met with DBA and DLBA employees James Wright and David Manardo, and City of Detroit Chief Procurement Officer Boysie Jackson regarding strategies to increase demolition volume over the following months. Wright, Manardo, and Jackson agreed that in order to increase the volume of demolitions under the HHF contract, they wanted to propose a "unit price" procurement contract, which would set a number of properties to be demolished and require contractors to bid on the project, rather than requesting specific bids per property, as the Conventional Demolition Program operated.  Wright and Manardo represented that they had discussed this idea with the Mayor and that he wanted to move forward in this way. Jackson provided a prior City of Detroit procurement contract for demolition under a Community Development Block Grant program ("CDBG") that had been unit price-based.

74.    Relator informed Wright, Manardo, and Jackson of the regulatory issues with this approach, and noted that in 2011, the United States fined the City of Detroit for violations of Community Development Block Grant ("CDBG") regulations for the utilization of demolition contracts under the CDBG program that involved bidding on a set number of homes without specific addresses.

75.    Despite Relator's warning that this was not a recommended approach, the DLBA decided to move forward with the high volume unit-price demolition contracts,

called "super bid packs," under the HHF Blight Elimination Program. The DLBA asked

ADR Consultants to put together the Request for Qualifications ("RFQ") and informed

the Michele Wildman of MSHDA of their proposed approach.

76.     On June 10, 2014, Wildman emailed Carrie Lewand-Monroe, Senior

Advisor at the DLBA, stating that the high-volume unit price approach would comply

with requirements so long as it followed a methodology which included:

> 1. calculating a unit price based on data from competitively bid HHF RFP's
> already completed
> 2. using that unit price to set the pricing for these "super bid packs"
> 3. offering contracts to all Michigan firms who respond and can demonstrate
> they meet the contractor requirements for these "super bid packs"

77.     Wildman also noted that it was her understanding that under Lewand-

Monroe's review of contractor capacity, "including a review of bonding, crew capacity

and equipment," only two firms in the area would meet qualifications using this

methodology.

78.     The next day, Lewand-Monroe responded and clarified that DLBA

planned to calculate a unit price "based on data from competitively bid HHF RFPs

already completed in accordance with step 1 below, and that unit price will be roughly

based on the average bid response received from those completed RFPs."

79.     Rather than base the unit price on the average bid responses as promised,

Defendant DLBA colluded with the Contractor Defendants to set a unit price that would

guarantee profits to the Contractor Defendants. Even if the unit price contracts had been

implemented as Lewand-Monroe described, based on data from the competitively bid

HHF RFPs, prices would have been inflated because, as described in Section V(A)(1)

*supra*, the DLBA awarded contractors who did not put forward the lowest bids.

80.     Prior to the issuance of the RFQ, DBA/DLBA employees James Wright

and David Manardo scheduled a meeting with Contractor Defendants MCM

Management, Homrich, and Adamo, as well as Bierlein, another Michigan-based

contractor. Wright and Manardo invited Relator to the meeting, but Relator declined,

because he believed it would violate open competition laws to set a price with potential

bidders.

     81.     On June 12, 2014, Wright and Manardo met with the Contractor

Defendants and Bierlein.  During the meeting, Wright and the Contractor Defendants

agreed to set a unit price at .52 cents per cubic foot for the demolition of houses under

high volume, unit price contracts.

     82.     The day after the meeting, on June 13, 2014, Wright emailed Relator with

the specifications agreed upon during the meeting: "What we agreed to with MCM,

Honrich [sic], Adamo, and Bierlein…. .52 per cubic foot as computed by Lidar data….

Minimum 100 units per week for 8 week period."

     83.     The .52 cents per cubic foot unit price was problematic for at least two

reasons. First, it was not based on the average bid response of the competitively-bid,

completed RFPs on the Conventional Demolition Program, as promised by Lewand-

Monroe.  Rather, it was arbitrarily set through a conspiracy between all Defendants to

guarantee profits. Second, setting the price by cubic foot rather than by square foot

allowed the overall price per property to rise substantially. Demolition is typically priced

either by fixed fee or by square foot.[1] The competitively-bid RFPs under the

Conventional Demolition Program were priced by stated cost, and reported by square

---

[1] *See e.g.* ProMatcher, *Demolition Costs & Estimates – ProMatcher Cost Report,*
http://demolition.promatcher.com/cost/ (last visited Nov. 28, 2017).

foot.

84.     Based on his extensive experience in the industry and his familiarity with normally uniform means of estimating and bidding contract costs by *square* footage and his observations about pricing of these contracts compared to what would be normal pricing for similar work, Relator believes and therefore alleges that measuring properties by *cubic* feet was a smoke-screening tactic that Defendants used in order to confuse pricing and make it difficult to make "apples-to-apples" comparisons between the pricing of homes in these Detroit-based contracts with pricing in other metropolitan areas in which traditional square-foot measurements were employed.  Moreover, measuring in cubic feet is an inherently dubious approach to bidding and paying for demolition work because it creates measurement numbers that are much higher than square-foot analogs, indicating that a project will require much more work than actually needs to be done. Cubic foot measurements allowed the Contractor Defendants to submit claims for and get paid extra amounts for the "demolition" of the almost entirely empty space that exists between the floors and ceilings within rooms of the houses to be demolished.

85.     Statistics confirm such concerns.  The average price per home for demolition under the Unit Price Program ranged from $13,305 to $18,310.  Under the square-foot-based conventional contracts, the average price per home for demolition ranged from $7,347 to $14,993.

86.     Later accommodations sought under the unit price contracts, as described in Section V(b)(2), *infra*, based on historical analyses of past demolition contracts in the area, were calculated by square footage, providing additional indicia that demolition contracts are properly paid per square foot, rather than per cubic foot.

-27-

87.     Immediately after the meeting between Defendant Contractors and City
Defendants where the unit price was set, the Request for Qualification ("RFQ") was
released to the public.  It was open to public bidding for only 48 hours, from July 17 until
July 19, 2014.

88.     The RFQ sought contractors able to complete 800 demolitions within 60
days.  Among other requirements, the RFQ required proof of ability to provide a 100%
performance bond and a certification that the contractor would "comply with all
applicable requirements of all other State or federal laws, executive orders, regulations,
and polices governing this program."

89.     With such a short window for submitting bids, the Contractor Defendants
who attended the planning meeting with city officials were the only three contractors who
to submit qualifications in response to the RFQ. All three of their qualifications were
accepted on June 23, 2014, and the contracts were sent to be executed on June 27, 2014.

90.     When sending the contract for review, Lyn Jordan, Program Manager at
ADR Consultants, reminded the contractors that they were required to obtain a 100%
Performance Bond and Certification of Insurance. For this contract, a 100% performance
bond would have to state that up to $8 million in surety was covered.  Immediately after
this notice was sent out, Wright contacted ADR and stated that $2 million would be
acceptable for a bonding amount.

91.     On average, companies must pay around 1.5% per $1,000 bonded for
contracts of this type. The accommodation of a $6 million reduction in bonding
requirements meant that the cost for bonding went from $120,000 per contractor
to approximately $30,000 per contractor.  In doing so, the City of Detroit exposed itself

to potentially $6 million in surety exposure.

92.    An accommodation of this sort was not provided to any other contractors

for any other part of Michigan's Blight Elimination Program, including any contractors

under the Conventional Demolition Program.

93.    John Adamo signed the contract and non-collusion affidavit on behalf of

Adamo Demolition on July 15, 2014.

94.    Scott Homrich signed the contract and non-collusion affidavit on behalf of

the Homrich Corporation on July 15, 2014.

95.    Robert Mardigian signed the contract and non-collusion affidavit on

behalf of MCM Management on July 16, 2014.

2.    Defendants Sought Accommodations Under the unit price
Contracts that led to Increased Costs.

96.    The awarded unit price contract was all-inclusive. Exhibit A to the unit

price contracts specified the work that was required, which included, among other

specifications:

> Demolishing all structures on the property with basement exterior walls,
> basement walls, basement, foundations, footings and slab-on-grade.
> Demolition including all structures on the property without a basement,
> including the removal of all exterior walls, foundations, footings and
> slab-on-grade. Structures containing asbestos will follow removal and
> disposal standards in accordance with the MDEQ NESHAP Asbestos
> Program and MDCIS Occupational Health Standards, Part 602, and
> applicable HOD and EPA requirements. All resulting holes or voids shall
> be backfilled to grade level and compacted with clean backfill.

97.    Despite language in the contract specifying that the scope of work

included the removal of any asbestos-containing material and to fill any holes with clean

backfill, the Contractor Defendants sought additional accommodations to perform this

work, which led to increased payments from HHF to which the Contractor Defendants

-29-

were not entitled.

98.     The Contractor Defendants sought and ultimately received accommodations leading to additional payments for abatement of asbestos-containing transite and plaster, and for backfill dirt, despite being part of the original specification and response.

99.     The Contractor Defendants sought accommodations for transite and plaster removal immediately after the unit price contracts were signed, before any work had begun.  On July 25, 2017, Eric Dovas from MCM Management Corporation wrote on behalf of all Contractor Defendantes to Relator, David Manardo, James Wright, requesting additional payment for transite and plaster removal above the unit price agreed to under the contracts.  Dovas stated that the contractors had each performed an independent analysis of their historical costs for transite and plaster removal and were now seeking an additional $2.35 per square foot for transite removal and an additional $4.10 per square foot for plaster removal.  In other words, the contractors were seeking an additional $6.45 per square foot for work that was already covered under the "all-inclusive" unit price contracts.

100.     The next day, on July 26, 2014, Relator wrote to David Manardo and James Wright with his analysis that the proposed additional costs related to transite and plaster removal would lead to approximately "20% premium over what I would consider normal and customary." Because approximately one quarter of the homes assigned in the first set of parcels under the unit price contracts required transite and plaster abatement, Relator estimated that approving the proposed additional costs would lead to an increase in payments under the contract of at least $4.8 million.

101.    In response to Relator's concerns, Manardo asked Relator whether he thought the additional charges for transite and plaster were reasonable given the timeline and operational requirements to make schedule. Relator acknowledged that due to the high-volume nature of this project, "an argument could be made," but outside of the expectations that each contractor would demolish 800 homes within the 60 day period, the additional costs were only "marginal[ly]" reasonable.

102.    The following week, Relator met with Wright and Manardo. At this meeting, Wright and Manardo verbally pressured Relator to produce a letter, on ADR Consultants letterhead, justifying the costs as reasonable. Relator refused.

103.    At this time, Relator felt that the DBA executives were pressuring him and ADR Consultants to justify any and all additional costs.  He was concerned that challenging the DLBA's approach would be putting his contract with MHSDA at risk. Relator called Wildman at MSHDA and reported these requests, and stated his concerns that these change orders were inappropriate due to the all-inclusive nature of the contracts and that these change orders would lead to inflated costs under the HHF BEP Program.

104.    On August 1, 2014, David Manardo responded to recipients and agreed to the extra price: "Please proceed with transite and plaster abatement for properties awarded in the HHF unit price releases based upon your quoted costs of $2.35/ft2 for Transite and $4.1/ft2 for plaster (as quoted in your attached email)."

105.    On September 3, 2014, Wright again asked Relator to write a letter on ADR letterhead approving the approximately 20% upcharge for plaster and transite due to capacity and time constraints. Relator refused.

106.    In addition, the Contractor Defendants sought accommodations that led to

payments for which they were not entitled in the form of payments for backfill dirt.

107.     Exhibit A to the unit price contracts specified that the contractors were required to provide and maintain "all qualified personnel, equipment, materials and other resources necessary to perform activities identified in Section 4, Scope of Services in a timely manner," which included the backfill of open holes.

108.     Because the unit price contracts required the contractors to provide all materials necessary to perform all activities under Scope of Services, the Contractor Defendants should have borne the cost of fill dirt. Instead, they sought extra payments for fill dirt, for which the DBA/DLBA agreed to pay.

109.     On August 12, 2014, Relator notified Wildman at MSHDA, alerting her of the problems with allowing additional payments for work that was explicitly specified under the unit price contracts, including transite and plaster removal, and the payments for fill dirt. At that time, Relator estimated that with the increased costs due to these accommodations, actual cost per property would be $16,000 or more, which was significantly higher than the cost per property under the Conventional Demolition Program.

110.     Relator recommended to Wildman that DLBA cancel 400-500 of the unit pricing volume and re-issue them under the Conventional Demolition Program in order to increase minority and local participation and reduce costs. Neither Wildman nor MSHDA took any action in response to Relator's concerns.

### 3.     Contractor Defendants Failed to Meet Deadlines Under the Unit Price Contract.

111.     The Contractors Defendants did not meet the deadlines set under the Unit

Price Program. By September 13, 2014, none of the contractors had completed the scheduled 60-day timeline for demolition at 100 houses per week. However, rather than seeking liquidated damages for failure to perform, as allowed under the unit price contracts, or cancelling the unit price contracts and re-issuing the properties under the Conventional Demolition Program, DLBA allowed the Contractor Defendants to continue work under the higher-priced unit price contracts.

112.    Because of ongoing violations, the DLBA terminated MCM's unit price contract in October 2014. MCM Management's violations included citations by the Department of Environmental Quality ("DEQ") regarding failures to abate asbestos containing material appropriately at certain addresses and failures to be at work sites for scheduled DEQ inspections, which led to a stop work order, and then moving forward with demolitions while under the stop work order.

113.    When DLBA terminated its contract, it allowed MCM to complete the properties already in process, approximately 100 parcels, but took away any remaining inventory not yet begun. The remaining 700 properties were re-issued and individually bid under the Conventional Demolition Program's HHF-1 and HHF-2 disbursements.

114.    City officials awarded one of the contracts for 145 properties that was a part of the re-issue to Homrich for $2.6 million. Three other companies had lower bids and Homrich's offer was $828,571 higher than the lowest bid. Homrich was awarded the contract even though they were failing to stay on schedule with their obligations under the unit price contract at that time. The award to Homrich was via the conventional demolition channel and represented a premium of $828,570.94 over the actual lowest qualified bid.

115.    Homrich and Adamo continued work under the unit price contract until spring 2015.

116.    MCM, Homrich, and Adamo did not submit claims for payment for the additional change orders covering the removal of asbestos-containing materials and for backfill dirt until long after the homes were demolished, in October 2015.  Carrie Lewand-Monroe approved the change orders on behalf of DLBA in November 2015.

117.    MCM completed work, submitted claims for payment, and was paid for the demolition of 305 homes under the unit price contract, for a total of $3,528,307. MCM submitted claims for payment and was paid $856,184 for completing asbestos abatement only at 156 additional properties

118.    Homrich completed work, submitted claims for payment, and was paid for the demolition of 698 homes under its original unit price contract, for a total of $8,371,385.  Homrich's completed work under the contract for the 145 houses that were originally assigned to MCM, submitted claims for payment, and was paid $2,545,195.

119.    Adamo completed work, submitted claims for payment, and was paid for the demolition of 654 under the unit price contract, for a total of $8,076,538.

120.    The claims for payment by the Contractor Defendants under the Unit Price Program were tainted by collusion when the Contractor Defendants and the DLBA officials set the price for the contract prior to the release of the RFQ in June 2014. Because of this, the claims for payment were false and/or fraudulent.

121.    Additionally, the claims for payment by the Contractor Defendants for the additional costs related to plater and transite should not have been paid because the unit price contracts explicitly specified that work was covered under the Scope of Services for

the contracts. The upcharge for the plaster and transite removal was not reasonable given that the Contractors Defendants did not meet the high-volume deadlines that ostensibly justified the additional costs.

122.    Even once it had to be apparent to DLBA that the houses were not getting demolished at a rate faster than those parceled out under the Conventional Demolition Program, DLBA continued providing work under the higher unit price contract, leading to waste of HHF funds and diminishment of BEP effectiveness.

**C.    Relator Reported the Misconduct to Federal Authorities.**

123.    Relator reported concerns to Michele Wildman at MSHDA beginning in at least March 2014 and continuing until ADR's termination by the state in April 2015. Relator spoke on the phone with Wildman over 20 times and met in person at least eight times, where Relator conveyed concerns about the lack of controls in the DLBA administration of the HHF BEP program, and about the resulting inflation of prices and exposure to the waste of federal funds.

124.    Relator contacted federal and local authorities, including Vivian Slaughter and Delores Bills-Jallow the Detroit's Office of the Auditor General in April 2015; FBI Agent David Hunt in August 2015; the hotline for the Special Inspector General for TARP ("SIGTARP") in November 2015; and SIGTARP Special Agent Keith Gessner beginning in February 2016, providing information on all alleged conduct described herein and relevant supporting documents in his possession.

**VI.    CLAIMS FOR RELIEF**

125.    Through the conduct discussed above, Defendants knowingly caused the submission of false claims and false statements material to false claims to be submitted to

the Government.

126.    All HHF funding received by Defendant contractors was provided by the Treasury, and disbursed through Treasury's appointed state partners. Defendants' fraudulent conduct directly led to losses of HHF funds, reducing the amount of blighted property that would have been removed from Detroit neighborhoods under the Blight Elimination Program.

## COUNT I
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

127.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 126 above as though fully set forth herein.

128.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

129.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

130.    By conspiring to receive, and in fact receiving, HHF Conventional Demolition Program contracts despite failing to be the lowest bidders, Defendants Adamo and Homrich fraudulently presented claims for HHF funds. These claims were both excessive charges, and in violation of state and local requirements for HHF BEP program bidding.

131.    By falsifying and shifting invoices between properties to avoid Treasury's mandated per-property cap, Defendants Adamo, MCM, Homrich and Rickmann intentionally circumvented a key control of the HHF Program, presenting false records to

claim excessive payout of federal HHF funds.

132.    Defendants Adamo, MCM and Homrich also fraudulently acquired federal HHF funds via the "Unit Price" Demolition Program. First, contractor Defendants fraudulently induced these contracts, submitting non-collusion affidavits as a required part of bids when in fact they had met with City Defendants to collude on the unit price. Second, Defendants conspired to, and in fact did, overcharge in their contracts in at least two ways: Defendants met, in secret, to set an inappropriately high "unit price" floor for the awards. After being awarded contracts, Defendants further overcharged by seeking federal HHF reimbursement for work which they knew was included in the "unit price" itself.

133.    Based on all the information set forth above and his understanding of the industry and how contractors are paid, Relator believes and therefore alleges that Contractor Defendants submitted hundreds of individual false claims to seek HHF reimbursement, as HHF funding is processed and disbursed on a per-property basis.

134.    Relator cannot at this time specify the dates and billing details of all of the false claims for payment that were caused by Defendants' conduct.  The false claims were presented by several separate entities.  Relator does not have access to the records of all such false or fraudulent statements, records or claims.  However, it is clear that such false and fraudulent bills, statements, records and claims had to be submitted as part of Defendants' fraudulent conduct and were paid, because that was the aim and purpose of the conspiracies and payments from federal funds were in fact made to the Contractor Defendants for work that was not properly payable to those contractors or for the total amounts those contractors were ultimately paid.

135.    The United States Government, unaware of the falsity of the legal and factual falsity of the claims made or caused to be made by Defendants, paid funds into the affected program and continues to pay claims related to the program that would not be paid by the United States -- or unlawfully advanced by State and local officials to Defendants -- but for Defendants' illegal conduct.

136.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

137.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein occurring prior to November 2, 2015, and $21,563 for each violation occurring after.

## COUNT II
### False Claims Act
### 32  U.S.C. § 3729(a)(1)(B)

138.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 126 above as though fully set forth herein.

139.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

140.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment paid by the Government and/or with federal funds that should not have been paid to Defendants at all and/or in inflated amounts actually claimed and paid.

141.    These acts include but are not limited to: Defendants Adamo, MCM, Homrich, and Rickman's "price splitting" scheme invoices for reimbursement,

intentionally allocated to incorrect addresses to avoid the Treasury cap; Defendant

Adamo, MCM, and Homrich's false certification of non-collusion presented to become

eligible for HHF funds, and each individual invoice for HHF reimbursement representing

overcharges under both the Conventional and Unit Price Demolition Programs.

142.    Relator cannot at this time identify all of the false claims for payment that

were caused by Defendants' conduct.  The false claims were presented by several

separate entities.  Relator does not have access to the records of all such false or

fraudulent statements, records or claims.

143.    The Government, unaware of the falsity of the records, statements and

claims made or caused to be made by Defendants, paid funds and continues to pay funds

into the affected program that ultimately passed on to Defendants from such programs

that would not be paid by the United States -- or unlawfully advanced to Defendants by

State and local officials -- that would not be paid but for Defendants' unlawful conduct.

144.    By reason of Defendants' acts, the United States has been damaged, and

continues to be damaged, in a substantial amount to be determined at trial.

145.    Additionally, the United States is entitled to the maximum penalty of up to

$11,000 for each and every violation alleged herein occurring prior to November 2, 2015,

and $21,563 for each violation occurring after.

**COUNT III**
**False Claims Act**
**33  U.S.C. § 3729(a)(1)(C)**

146.    Relator realleges and incorporates by reference the allegations contained

in paragraphs 1 through 126 above as though fully set forth herein.

147.    This is a claim for treble damages and penalties under the False Claims

Act, 31 U.S.C. § 3729, *et seq.*, as amended.

148.   By virtue of the acts described above, each Defendant named herein knowingly entered into one or more conspiracies with the other Defendants and others to violate the FCA (a) by submitting or causing the submission of false claims to be paid with federal funds and/or (b) by creating and/or using (and/or by causing the creation and use) of false records and statements material to the payment of false claims to be paid with federal funds.  Moreover, each Defendant names herein took substantial steps toward the completion of the goals of that conspiracy through the acts alleged in the paragraphs above.

149.   City Defendants, including Doe Defendants, conspired with Contractor Defendants Adamo, Homrich, and those contracting entities' principals to approve bids for Conventional Demolition Contracts, despite such bids being higher than the lowest bid presented. Contractor Defendants thereafter submitted inflated bids, which were approved by co-conspirator City Defendants.

150.   City Defendants, including Doe Defendants, also conspired with Defendants Adamo, MCM, Homrich, Rickman, those contracting entities' principals, and other non-party contractors to circumvent the Treasury per-property reimbursement cap, to enrich selected contractors. City Defendants thereafter suggested falsification of records to accomplish the planned fraud; Defendant Contractor co-conspirators created and submitted these false records to City Defendants; and City Defendants submitted these false records to State authorities to obtain inflated federal HHF reimbursements for the Contractor Defendants. The scheme served to thereby curry and reward the loyalty of the Contractor Defendants and their principals to Doe Defendant City officials and/or

their superiors within City governments.

151.    City Defendants, including Doe Defendants, also conspired with Contractor Defendants Adamo, MCM, Homrich, and those contracting entities' principals to fraudulently enrich Contractor Defendants via the "unit price" contracts.  These contracts, awarded at an inflated price, were the result of fraudulent price collusion between conspirators. Contactor Defendants caused further damage to the federal HHF funds by the submission of knowingly redundant "change orders," which were approved by co-conspirator City Defendants.

152.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false claims were presented by several separate entities.  Relator does not have access to the records of all such false or fraudulent statements, records or claims.

153.    The Government, unaware of the conspiracies entered into by Defendants to make false claims against federal funds and to create false records, statements (and/or to cause the creation of falls claims, records or statements) made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

154.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

155.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein occurring prior to November 2, 2015, and $21,563 for each violation occurring after.

## VII.  **PRAYER**

WHEREFORE, Relator prays for judgment against all Defendants as follows:

1.     That all Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.* and the analogous States statutes set forth above;

2.     That this Court enter judgment jointly and severally against all Defendants in an amount equal to three times the amount of damages the United States and the States have sustained because of the actions of any and all Defendants' actions or their non-party co-conspirators, plus the maximum civil penalty permitted for each violation of the False Claims Act and the analogous State statutes;

3.     That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and the equivalent provisions of the State statutes set forth above.

4.     That Relator be awarded all fees, costs, and expenses incurred in connection with this action, including attorneys' fees, costs, and expenses; and

5.     That Relator recover such other relief as the Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: November 29th, 2017

Respectfully submitted,

/s/    *Peter W. Chatfield*

Peter Chatfield (DC Bar No. 418576)
*Counsel of Record*
PHILLIPS & COHEN LLP

2000 Massachusetts Ave. NW
Washington, D.C.  20036
Tel: (202) 833-4567
Fax: (202) 833-1815
pchatfield@phillipsandcohen.com

Taeva C. Shefler (*pro hac vice* pending)
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001
tshefler@phillipsandcohen.com

Attorneys for *Qui Tam* Plaintiff-Relator
Barry Ellentuck